UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VAUNIA MORRISON,<br><br>    Plaintiff,<br><br>    v.<br><br>KAREN G. MILLS, Administrator, U.S. Small Business Administration<br><br>    Defendant. | Civil Action No. 10-2329 (JDB) |

## MEMORANDUM OPINION

Plaintiff Vaunia Morrison alleges that she was subjected to retaliation and discrimination based on race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., when her request to transfer to a different position was denied. She also contends that she was subjected to a hostile work environment based on retaliation. Defendant Karen Mills, in her capacity as Administrator for the U.S. Small Business Administration, has moved for summary judgment. For the reasons set forth below, the Court will grant defendant's motion.

## BACKGROUND

Vaunia Morrison, an African-American woman, is a GS-13 Program Analyst assigned to the Office of Business Development within the Small Business Administration. During all relevant times, Morrison was part of the Termination Team, which worked on termination actions for businesses participating in a particular development program. Linda Waters was Team Leader. Morrison's first-line supervisor was Mariana Pardo and then, beginning in 2008, Leo Sanchez. Leanne Delaney was the second-line supervisor, and Joseph Loddo was the third-

line supervisor. See Pl.'s Statement of Disputed Material Facts [Docket Entry 23-2] ¶¶ 1-4, 7-8, 34 (July 31, 2012).

Morrison told her supervisors on multiple occasions beginning in November 2007 that she wanted to transfer to another division. Id. ¶¶ 9, 19. Loddo advised Morrison that she could apply and compete for another position via USAJobs.com or find someone to swap positions with her, and that he would ask about other available positions. See Loddo Dep. [Docket Entry 18-4] at 7:10-17 (June 21, 2012). Morrison did not apply for any Small Business Administration jobs and "[t]o her knowledge, there were no job announcements made by the [agency] relevant to her skills and experience." Pl.'s Statement of Disputed Material Facts ¶ 49. Loddo subsequently transferred two other employees, Luke Williams, an African-American male, and Bohdan Kilyk, a white male, within the Office of Business Development, directing them to report directly to him rather than to their prior first-line supervisor, Teresa Lewis. Id. ¶¶ 37, 39-40. But Morrison remained under Team Leader Waters. Morrison considers her request to transfer denied on the date she made her final request to Loddo, March 17, 2008. See id. ¶ 22; see also Pl.'s Opp. to Def.'s Mot. for Summ. J. [Docket Entry 23-1] at 10 (July 31, 2012) ("Pl.'s Opp.").

On the Termination Team, Morrison had a number of conflicts with Waters. Morrison perceived Waters as "rude" and "cold." See Morrison Dep. [Docket Entry 18-10] at 23:18-19 (June 21, 2012). Taken in the light most favorable to Morrison, the record reflects that Waters invited other team members to certain meetings Morrison ultimately attended, allowing Morrison to overhear that a meeting was to take place without inviting her directly. Id. at 24:23-26:7. She accused Morrison of misplacing files, see Waters 2012 Dep. [Docket Entry 23-8] at 59:4-15 (July 31, 2012). Morrison and Waters also disagreed over the appropriate level of guidance Morrison should receive. See Ex. H to Pl.'s Opp. [Docket Entry 23-11] at 8, 19 (July 31, 2012).

Waters and first-line supervisor Sanchez criticized Morrison's work. See, e.g., Morrison Dep. at 45:22-46:6. They even held a meeting where they criticized Morrison without giving her prior notice that such a meeting would take place. Id. at 41:21-42:21. Finally, Waters and Sanchez assigned Kimberly Mace, another team member who was at the GS-12 pay grade, rather than Morrison, to carry out certain Team Leader tasks in Waters's absence. See Waters 2012 Dep. at 49:8-50:15.

On June 3, 2008, Morrison filed an Equal Employment Opportunity (EEO) complaint against Waters, Pardo, and Loddo based on the non-transfer. See Pl.'s Statement of Disputed Material Facts ¶ 23; see also June 2008 EEO Complaint [Docket Entry 17-25] (June 18, 2012). On December 11, 2008, she filed an EEO complaint against Waters and Sanchez alleging a hostile work environment based on reprisal for her prior EEO activity. See Pl.'s Statement of Disputed Material Facts ¶ 35; see also Attach. to June 2008 EEO Complaint [Docket Entry 17-28] (June 18, 2012). Morrison had filed two prior EEO complaints, one in 2003 and one in 2005, against different officials. See Pl.'s Statement of Disputed Material Facts ¶¶ 27-28, 33.

Morrison filed this action on December 29, 2010. After discovery completed, defendant filed the instant motion for summary judgment.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents,

3

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## ANALYSIS

I. **Failure to Transfer Morrison**

    a. **Sex and Race Discrimination Claims**

Morrison contends that she was denied a transfer due to race and sex discrimination and in retaliation for her prior protected activity. The claim, however, founders at the outset because Morrison has established no adverse employment action cognizable under Title VII.[1]

As the D.C. Circuit has explained,

> a plaintiff who is made to undertake or who is denied a lateral transfer—that is, one in which she suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively

---

[1] The Court thus need not assess defendant's asserted legitimate reason for Morrison's non-transfer.

4

tangible harm. Mere idiosyncracies of personal preference are not sufficient to state an injury.

Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999). Morrison sought a quintessential "lateral transfer" that would have no effect on her pay or benefits. Id. And she has identified no "materially adverse consequences" that constitute "objectively tangible harm." Id.

Taking the transfers of Williams and Kilyk, the two individuals Morrison alleges were similarly situated, as representative of the position she could have obtained, upon transfer Morrison would have been supervised by a different supervisor and would have worked in a different environment. But Morrison has presented no evidence that a transfer would have presented her with "significantly different" and improved responsibilities. See Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008); see also Youssef v. FBI, 687 F.3d 397, 401 (D.C. Cir. 2012). She does not dispute that the desired transfer would have no effect on her pay, benefits, or supervisory responsibilities. Although Morrison asserts that "the denial of reassignment prevented [her] from obtaining career enhancing opportunities and training," Pl.'s Opp. at 12, she has pointed to no record evidence supporting this assertion nor identified any such opportunities. And she has not identified any training opportunities or added responsibilities Williams and Kilyk obtained after the transfer.

Morrison also argues that the denial harmed her by forcing her "to remain under the hostile conditions created by" Team Leader Waters, whom Morrison perceived as "rude and demeaning" as well as unfairly critical. See id. at 11-12. That is not enough. Although remaining on Walter's team was undesirable to Morrison, "not everything that makes an employee unhappy is an actionable adverse action." Brown, 199 F.3d at 457 (internal quotation marks omitted). Indeed, the D.C. Circuit has found no actionable adverse action where a reasonable jury could find that a new assignment "was generally less favorable than other assignments," Jones v. D.C.

5

Dep't of Corr., 429 F.3d 276, 281 (D.C. Cir. 2005). Similarly, it found no adverse action where changes resulted in plaintiff supervising fewer people, no longer attending management meetings or receiving management-related communications, and working with a supervisor critical of his work because plaintiff "failed to provide any evidence, beyond his conclusory assertions of loss of prestige, of any adverse consequence to his position or future career." Forkkio v. Powell, 306 F.3d 1127, 1129, 1130-31 (D.C. Cir. 2002) (internal quotation marks omitted). The law is clear: the unpleasantness or undesirability of a work situation is not enough absent adverse consequences to either present or future employment. Again, Morrison has provided no evidence of any adverse consequences, relying instead on her subjective perception that the "hostility negatively affected Ms. Morrison's work environment and productivity." Pl.'s Opp. at 12 (citing plaintiff's declaration in support of her EEO complaint). "[P]urely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation," however, "are not adverse actions." Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006) (internal quotation marks omitted). A failure to reassign that forces an employee to remain in a position concerning which she is dissatisfied or even feels demeaned, is similarly not actionable.

Although the preceding analysis provides ample basis to grant defendant's motion, it is worth noting that Morrison's type of claim is particularly weak. The D.C. Circuit has emphasized that "there are few circumstances in which a mere lateral transfer can rise to the level of an adverse employment action." Jones, 429 F.3d at 281. And Morrison's actual claim—that she was not transferred—presents an even weaker case: rather than being moved to a less desirable post, she was simply not afforded an opportunity to obtain one that was subjectively more desirable (although materially similar). Morrison has identified only one case where a non-transfer—as opposed to a transfer to a materially different position—amounted to an adverse

6

action. There, plaintiff was not selected for his supervisor's job, a transfer that was akin to a "promotion," that the defendant itself conceded was "higher in the hierarchy," and which carried the same pay and benefits due to the unique structure of the agency in question. Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2003) (internal quotation marks omitted). Morrison's case is far different: she concedes that there were no vacancies matching her skills and abilities. See Pl.'s Statement of Disputed Material Facts ¶ 49. She failed to identify a position to which she would have been transferred, let alone established that the desired position would be "higher in the hierarchy," Stewart, 352 F.3d at 427 (internal quotation marks omitted), than her current role. A court second-guessing an employer's decision not to create a position in order to transfer an employee in such circumstances threatens impermissible "judicial micromanagement of business practices," see Baloch, 550 F.3d at 1197 (internal quotation marks omitted), allowing any perceived workplace slight to be the subject of a Title VII action. This offers further support for rejecting Morrison's adverse action argument.

### b. Retaliation Claim

The standard for actionable retaliation is broader than for discrimination. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). "The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67. To establish an actionable event for a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (internal quotation marks omitted).

Because the challenged action must be "materially adverse," where the alleged retaliatory action is employment-related the standard for an adverse action is functionally identical to that in

7

the discrimination context. See Pardo-Kronemann v. Donovan, 601 F.3d 599, 607 (D.C. Cir. 2010) (applying "materially adverse consequences affecting the terms, conditions, or privileges of the plaintiff's employment" test to retaliatory transfer action). Morrison has identified no materially adverse consequences from the non-transfer, nor "significantly different responsibilities" that a transfer would provide, see id. (internal quotation marks omitted), and hence a reasonable juror could not conclude that the non-transfer would dissuade a reasonable worker from engaging in EEO activity.

Morrison's retaliation claim also fails for an independent reason: she has not established a causal connection between her protected activity and her non-transfer. To show a causal link, a plaintiff "must show that the [employer] had knowledge of [plaintiff's] protected activity, and that the adverse personnel action took place shortly after that activity." Holbrook v. Reno, 196 F.3d 255, 263 (D.C. Cir. 1999) (internal quotation marks omitted); see also Holcomb, 433 F.3d at 903. Morrison's protected activity lacks the requisite temporal proximity to the non-transfer because even the most recent activity, an EEO complaint filed in March 2005, occurred three years before the non-transfer. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001) ("Action taken . . . 20 months later suggests, by itself, no causality at all."); Woodruff v. Peters, 482 F.3d 521, 529 (D.C. Cir. 2007) (temporal proximity supports an inference of causation "only where the two events are 'very close' in time"); see also Allen v. Napolitano, 774 F. Supp. 2d 186, 201 n.2 (D.D.C. 2011) ("In the D.C. Circuit, courts have held that alleged retaliatory acts must occur within three or four months of the protected activity to establish causation by temporal proximity."). Finally, the fact that Morrison's prior EEO complaints concerned an entirely different set of decision-makers further weakens any inference of retaliation. See Vickers v. Powell, 493 F.3d 186, 196 (D.C. Cir. 2007) (holding that no reasonable jury could

"find a retaliatory motive at work" where deciding official never "participate[d] in any of the alleged incidents that make up [plaintiff's] [underlying] claim"); see also Gilbert v. Napolitano, 670 F.3d 258, 263 (D.C. Cir. 2012) ("no reasonable jury could infer that the mere mention of such long-ago activity at a distant office would give [an official] a reason to discriminate[,]" especially given that the official "had no involvement in the events underlying [plaintiff's protected activity]").[2]

## II.  Hostile Work Environment Claim

Morrison alleges that the team leader Linda Waters and first-line supervisor Leo Sanchez created a hostile work environment based on retaliation. Viewed in the light most favorable to Morrison, the record reflects that, soon after Waters came on board in 2007, she began to treat Morrison in a "rude" and "cold" manner. See Morrison Dep. at 23:18-19, 28:4-29:22. Waters invited other team members to certain meetings Morrison ultimately attended, allowing Morrison to overhear without inviting her directly. See id. at 24:23-26:7. Waters kept case files in a locked office. See id. at 29:25-30:2. She accused Morrison of misplacing files, see Waters 2012 Dep. at 59:4-15, and together with Sanchez blamed Morrison for leaving a package on one of their chairs although doing so consistent with common practice, see Morrison Dep. at 43:5-21. Waters declined to offer requested guidance as to what Morrison should put in the termination letters, see Ex. H to Pl.'s Opp. at 8, 19. Together with other supervisors, Waters held a meeting with Morrison that was confrontational in tone. Id. at 19:3-20:3. Waters and Sanchez held an impromptu meeting where they criticized Morrison. Id. at 41:21-42:21. Finally, when Waters went on leave between June 30, 2008, and July 8, 2008, and again on at least one date in

---

[2] Morrison attempts to show a causal link by pointing out that another employee without prior EEO activity was treated more favorably, i.e., allowed to transfer. That, however, is not enough: knowledge and temporal proximity are needed to create an inference of causation in the absence of direct evidence. See Holcomb, 433 F.3d at 903; Holbrook, 196 F.3d at 263. Morrison cites no cases where different treatment of an employee without protected activity sufficed. Besides lacking legal authority, her argument is particularly weak on the facts here because, as Morrison concedes, one of the two employees treated differently had engaged in prior protected activity.

September 2008, she and Sanchez assigned Kimberly Mace, another team member who was a GS-12, certain Team Leader tasks. See Waters 2012 Dep. at 49:8-50:15.

To establish a hostile work environment, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted); see also Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006) (holding that this standard applies to retaliatory hostile work environment claim). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Baloch, 550 F.3d at 1201.

Taking these facts in the light most favorable to Morrison, a reasonable jury could conclude that she worked in an unpleasant setting where her supervisor treated her with some disrespect. But the conduct she describes does not come close to the severity or abusiveness required for an actionable hostile work environment claim. Indeed, none of the instances alleged amount to objective harm with tangible workplace consequences. See id. (rejecting hostile work environment claim where "[plaintiff's] claims of harm are not supported by evidence of tangible workplace consequences, whether financial, physical, or professional"). For instance, Waters' announcing a meeting to other team members by name within Morrison's earshot might well have made Morrison feel excluded, but it did not prevent her from attending the meeting. See Morrison Dep. at 26:3-4. That case files were kept in a locked room so she had to go through Waters or Mace to obtain them was surely inconvenient, but Morrison agrees that this never caused a significant delay in obtaining a file she needed. See Pl.'s Answers to Interrogs. [Docket

10

Entry 25-9] at 8 (Aug. 20, 2012). That Mace, a lower-graded employee, was asked to serve as acting Team Leader also created no harm. Acting as team leader involved no substantive work, but only administrative tasks like inputting information about termination action letters into the tracking system. The record is undisputed that Mace never substantively reviewed Morrison's work, although she did "sign off on some work . . . just to show that it had already been moved over in the system." Mace Dep. [Docket Entry 18-6] at 30:11-13 (June 21, 2012); see also Waters 2009 Dep. [Docket Entry 18-20] at 10:4-8 (June 21, 2012) ("Kim [Mace] really cannot review, she would initial off on it before she put it back into the system, to let me know that it had been inputted into the system before it went on to the next line of the chain of command."). Although Morrison states that she felt demeaned by having a lower-graded employee sign off on her work, this does not amount to objective harm. See Patterson v. Johnson, 505 F.3d 1296, 1298 (D.C. Cir. 2007) ("there is no evidence that materially adverse consequences to Patterson's employment could have flowed from Davis's not designating him as Acting Director of OAM for a single day" where plaintiff argued that action made him feel "undermined"). Nor did Waters' or Sanchez's substantive criticism create tangible harm, especially given that Morrison's performance ratings remained satisfactory (and, indeed, improved under Waters as Team Leader), see Morrison EEO Decl. [Docket Entry 25-3] at 4 (Aug. 20, 2012).

  Moreover, even if these incidents could be viewed as objectively harmful (which they cannot be), none of them reflect the extreme conduct necessary to transform "the ordinary tribulations of the workplace" into a hostile work environment claim. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). That a work environment is "hardly ideal" does not suffice. See Hussain, 435 F.3d at 366 ("Although the work environment described by [plaintiff] was hardly ideal, we think no reasonable jury could

11

find it 'abusive' under the standard set forth in Harris."). In short, Morrison's relatively routine complaints about her work environment do not amount to a hostile work environment claim based on retaliation.[3]

### III.   Assignment of a Lower-Graded Employee as Acting Team Leader

Finally, Morrison's complaint alleges that her supervisors' decision to assign a lower-graded employee to act as Team Leader was itself actionable retaliation. Morrison never mentions this as an independent claim in the argument section of her opposition, and she offers no response to defendant's argument that the non-assignment failed to amount to an actionable adverse action and was done for legitimate, non-retaliatory reasons. Hence, she has conceded this claim. See Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), aff'd, 98 F. App'x 8 (D.C. Cir. 2004).

In any case, the claim would fail on the merits. The loss of an opportunity to be acting Team Leader caused Morrison no objective harm. The record is undisputed that acting as Team Leader involved no substantive responsibilities, but only administrative tasks. Morrison has provided no evidence that the loss of an opportunity to carry out such tasks harmed her career opportunities in any way, and it is difficult to conceive how such harm would be possible. Absent detrimental effects, any offense that Morrison felt at having a lower-graded employee formally sign off on her work is not actionable harm. See Holcomb, 433 F.3d at 902; see also

---

[3] Nor has Morrison indicated that Waters or Sanchez ever mentioned her protected activity, that any comments could be viewed as referring to that activity, or that any of the allegedly negative treatment otherwise had a retaliatory overtone. This further weakens any inference that the negative treatment constituted a hostile work environment based on retaliation. See Baloch, 550 F.3d at 1201 (rejecting hostile work environment claim in part because "none of the comments or actions directed at [plaintiff] expressly focused on his race, religion, age, or disability").

Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."). The non-assignment was therefore not an adverse action under Title VII.

## **CONCLUSION**

For these reasons, defendant's motion for summary judgment will be granted. A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: March 11, 2013